# Wytheville

## WHITTLE v. DAVIE.

### June 11, 1914.

#### Absent, Whittle, J.

1. PARTNERSHIP—*Good Will—Value—How Computed—Divided How.* The "good will" of a firm is a part of the firm's assets, and upon dissolution every partner is entitled to have it converted into cash and included in the firm's accounts, unless by his agreement or conduct he has precluded himself from asserting such right. In computing its value, the basis should be the annual profits before dissolution. The annual profits are resorted to merely as throwing light upon and as affording a reasonable mode by which the value of the intangible asset known as good will may be proximately measured and ascertained, but good will is not profits, and profits are not good will. Profits are the gains realized from trade. Good will is that which brings trade.

2. PARTNERSHIP—*Good Will—Value—Case in Judgment.*—The "good will" of a firm is a property right and an asset of the firm which is to be divided like all the other assets, in the absence of specific agreement, in the proportion in which the partners have contributed to the partnership capital. In the case in judgment, the firm sold out its plant and business and there was a surplus over and above the input of the partners. The price paid was in part based upon the annual profits of the firm for four years prior to the sale. To this extent appellant claimed that the price represented profits and to be divided as such according to the partnership agreement, but it is held that the annual profits were only considered for the purpose of ascertaining the price to be paid, and that what was realized was not profits as such, but the price of the good will of the firm and to be divided in the proportion in which the partners had contributed to the capital of the partnership. For definitions of "good will" see opinion of the court.

Appeal from a decree of the Circuit Court of the city of Petersburg. Decree for the defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Wm. B. McIlwaine,* for the appellant.

*R. B. Davis, Turnbull & Turnbull* and *Christian, Gordon & Christian,* for the appellee.

Keith, P., delivered the opinion of the court.

In 1891 there was a partnership in the city of Petersburg under the name of Davie & Whittle, in which Davie owned a two-thirds interest and Allison and Addison the other third, Whittle having no interest in the assets of that firm. This partnership expired on August 31, 1891, and thereupon Whittle became the purchaser of the one-third interest owned by Allison and Addison in the realty, machinery, trade marks, brands and good will of the former partnership, and Davie and Whittle formed a new partnership under the firm name of Davie & Whittle. This partnership began September 1, 1891, and was to continue from year to year or until the death of one of the parties. In the articles of copartnership it was provided, that the firm name was to be Davie & Whittle, and was formed for the purpose of conducting the business of the manufacture and sale of fertilizers and fertilizer materials; that Pascal Davie was to contribute to the capital of the firm his two-thirds interest in the realty and machinery of the firm of Davie & Whittle which expired on August 31, 1891, and his share of the assets of the old firm. Whittle was to contribute to the firm his one-third interest in the realty and ma-

chinery of the firm of Davie & Whittle which he had purchased from Allison and Addison, and was to put into the concern in addition one-half as much money as was to be contributed by Davie, and should the money contribution of Whittle to the capital of the concern exceed one-half of the money contribution of Davie, then Whittle was to receive eight *per cent. per annum* from Davie on such excess. Pascal Davie, therefore, owned two-thirds of the real estate, machinery, brands and trade marks of the concern, and Whittle owned one-third. It was agreed that a salary of $5,000 *per annum* was to be paid to Whittle, which was to constitute a first charge against the annual earnings of the concern. After the payment of the $5,000 to Whittle, the earnings up to $35,000, of which the $5,000 paid to Whittle was to be a part, were to be divided in the proportion of two-thirds to Davie and one-third to Whittle, and if the earnings should be in excess of $35,000 annually, all in excess of that sum was to be divided equally between Davie and Whittle.

The partnership was successfully conducted under these articles until the firm was dissolved in 1895. By an agreement bearing date on October 4, 1895, but which by agreement of the parties was to take effect as of July 1st of that year, Davie & Whittle sold to the Virginia-Carolina Chemical Company their business of manufacturing fertilizers, including all lands, buildings and fixed plant, machinery and fixtures used in conducting the business of said firm, and the good will, brands and trade marks of such business; and the firm further agreed to pay to the Virginia-Carolina Chemical Company in cash, or its equivalent, the sum of $97,000; and in consideration thereof the Virginia-Carolina Chemical Company agreed to transfer and deliver to Davie & Whittle fifteen hundred and fifty shares of its preferred stock and thirty-three hundred and ninety-one shares

37

of its common stock; and in pursuance of that agreement Davie & Whittle, on October 5, 1895, conveyed to the Virginia-Carolina Chemical Company the lands, buildings, plant, fixtures, machinery, good will, brands and trade marks agreed to be transferred as aforesaid. Davie & Whittle also paid to the Virginia-Carolina Chemical Company the sum of $97,000 in cash or its equivalent, as agreed upon, and received from the Chemical Company the shares of preferred and common stock as agreed upon, and at the same time Davie & Whittle subscribed in addition to ten shares of the preferred stock and paid for the same in cash, making the total number of shares of preferred stock in the name of Davie & Whittle fifteen hundred and sixty.

When this contract was executed by Davie & Whittle, they agreed that Whittle should take possession of the books, accounts and assets of the firm of Davie & Whittle, and wind up the business by selling the tangible property of the concern not conveyed and assigned to the Virginia-Carolina Chemical Company, and should collect all amounts due and owing to the concern, and pay its debts, rendering an account thereof to his copartner, Davie. It was also agreed that Whittle, out of the assets of the firm, would pay over to the Virginia-Carolina Chemical Company the $97,000 agreed to be paid under the agreement hereinbefore recited. It was further agreed that Davie was entitled to two-thirds of the preferred stock and Whittle to one-third; but inasmuch as it was thought possible that it would be necessary for the partners to advance additional money to the concern for the purposes of raising and paying the $97,000, it was agreed between Whittle and Davie that Davie would leave two hundred and fifty shares of his part of the preferred stock and Whittle would leave one hundred and twenty-five shares of his part of the preferred stock

in the hands of the concern of Davie & Whittle for the purpose of enabling Whittle, who had undertaken to wind up the affairs of the firm as above stated, to raise and pay over the sum of $97,000.

All the affairs of the firm of Davie & Whittle seem to have been satisfactorily adjusted until they came to the distribution of the common stock of the Chemical Company, with respect to which there was a disagreement, which resulted in the suit now before us.

The Virginia-Carolina Chemical Company, a New Jersey corporation, was organized for the purpose of acquiring control of a large part of the fertilizer business by purchasing the properties of a number of independent companies engaged in that business. The principle upon which it seems to have organized was that the capital stock issued upon its formation was to be based upon the earnings of the firms purchased by it; that the average annual earnings of the constituent companies for four years next preceding and ending July 1, 1895, should be ascertained, and that should these earnings be equivalent to or exceed eight *per cent. per annum* on five million dollars, the issued capital should be arbitrarily made five million dollars; and should these earnings be less than eight *per cent. per annum* on five million dollars, then the issued capital should be a sum of which the annual earnings would be eight *per cent.*

A committee of experts were employed, who visited the offices of the several vendors, and ascertained the aggregate earnings in question to be four hundred and twenty-one thousand, two hundred and thirty-six dollars, and the earnings of Davie & Whittle to be forty-three thousand seven hundred and thirty-eight dollars; and as a result of this investigation the capital stock of the Virginia-Carolina Chemical Company was fixed at five millions of dollars. It was agreed by the parties in

interest, the vendors of the constituent companies and the Virginia-Carolina Chemical Company, that two classes of stock should be issued, preferred and common, which were to be divided in the following manner: The factory and equipment of each company was to measure up to a certain standard of excellence, and any vendor whose factory and equipment failed to so measure up to this standard, was assessed the cash sum necessary to bring it up to this standard. All the factories and offices of the vendors were valued in the mode agreed upon, and the value of the several "plants" was fixed, it being agreed that the term "plant" should include real estate, machinery, brands and trade marks, and for every dollar of value of the "plant" as above defined the vendor was required to contribute a dollar in cash to the cash capital of the company. The common stock to be issued was what remained of the five millions after deducting the preferred stock. Under this arrangement the company paid the vendors in its preferred stock for the plants, and the vendors were required to buy as much of the company's preferred stock at par as the company had paid them for their plants.

It appears that some of the constituent companies who were vendors had small plants but large earnings, while others had large plants, but their business was newer and less profitable, and as a concession to the vendors of the latter class, instead of dividing all of the common stock among all the vendors in the proportion that the earnings of each bore to the total common stock issued at the company's formation, it was decided to take two-fifths of the common stock issued, and to give each vendor such proportion of this two-fifths as the plant value and cash he had contributed bore to the whole aggregate sum of plant value and cash. The remaining three-fifths of the common stock was divided among the ven-

dors in the proportion that the earnings of each vendor bore to the total earnings.

With respect to the preferred stock and the two-fifths of the common stock issued upon the basis of plant value and cash paid, there is no controversy. With respect to the three-fifths of the common stock, the issue of which was to be measured by the proportion that the earnings of each vendor bore to the total earnings, the claim upon the part of the appellant is that those three-fifths of the common stock are to be distributed in accordance with article 4 of the articles of copartnership entered into by Davie & Whittle September 1, 1891.

The average earnings of the firm of Davie & Whittle were ascertained and fixed by the committee charged with that duty at $43,738, which the appellant claims should be distributed in obedience to the fourth article of copartnership, as follows: From the first $35,000 Whittle's salary of $5,000 was to be deducted; one-third of the $30,000 was to be paid to Whittle and one-half of all above $35,000—that is to say, $5,000 plus $10,000 plus one-half of $8,738 which was the excess over $35,000, which would give him $19,369.

The contention of appellee is that the common stock should be divided just as the preferred stock and other assets were—in the proportion of two-thirds to Davie and one-third to Whittle; and that was the view taken by the circuit court as embodied in its decree which is before us upon appeal.

It appears from the accounts filed in the record that for every year the firm of Davie & Whittle was in existence, from September, 1891, until July, 1895, every dollar of the earnings of the company was distributed between Davie and Whittle in exact accordance with the rights of each under their articles of copartnership. Every dollar that had been earned by the firm of Davie

& Whittle during its existence had been fully accounted for. It is impossible to consider the $43,738, which is the estimated earning capacity of Davie & Whittle as actual earnings to be distributed as though it were money in the treasury of Davie and Whittle earned by the business conducted by the firm. Distributed upon the basis of the fourth article of the copartnership agreement, the appellant Whittle would be entitled to $5,000 as the managing partner for a business that passed out of existence in July, 1895.

The true view, we think, is that the $43,738, the estimated earning capacity of the firm of Davie & Whittle was merely the basis or measure by which the rights of the parties in the three-fifths of the common stock were to be ascertained. It was not earnings but earning capacity which was being considered. It represents not actual earnings, for every dollar actually earned had already been disposed of and the partnership which was being settled up had gone out of existence. The preferred stock and two-fifths of the common stock were issued in payment for the plants, which included, as we have seen, real estate, machinery, brands and trade marks. The three-fifths was, as between the chemical company and the firm of Davie & Whittle, to be measured by the estimated annual earnings, but with its distribution between Davie and Whittle the Chemical company had not concern. As we have said, it represents, not earnings, but earning capacity.

It is urged on behalf of appellant that were he to demand a settlement in strict accordance with the law, that he would be entitled to more than he now claims—that if the division is not to be made upon the basis of the copartnership articles, then the articles are silent as to the distribution of profits and that with respect to the profits earned by the partnership each partner is

entitled to share equally; and for this position he relies upon the case of *Smiley* v. *Smiley,* 112 Va. 490, 71 S. E. 572, where it is said, that "in the absence of any agreement, express or implied, the general rule is that partners are to share the profits and losses of the business equally, although they may not have contributed equally to the partnership capital, but this is not the rule as to the division of the partnership capital. Partners, however, may agree bewteen themselves for an equal division of the capital though their input was unequal."

It is strongly contended on behalf of appellant that the $43,738 represented profits; that every charge against the partnership concern has been satisfied, and that what remains over and above must necessarily be profits and is to be divided either in accordance with the contention that he makes, or that he would receive a still larger share if the division is to be made in accordance with the general principles of law. His whole case, therefore, turns upon the proposition that the sum for which the stock in dispute was issued constituted profits.

In this contention we cannot concur. We are of opinion that it represented the good will of the firm of Davie & Whittle, which is recognized as a property right and as an asset of the firm which is to be divided like all the other assets, in the absence of specific agreement, in the proportion in which the partners have contributed to the partnership capital.

"Good will" is defined to be, "The advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or from celebrity or reputation for skill or affluance or punctuality, or from other accidental circum-

stances or necessities, or even from ancient partialities or prejudices.'' Words and Phrases, Vol. 4, p. 3128.

And again, in the same volume: ''Good will is the favor which the management of a business wins from the public, and the probability that old customers will continue their patronage and resort to the old place. Good will is an advantage or benefit which is acquired by business establishments, beyond the mere intrinsic value of the capital stock. It is the general public patronage and encouragement which a business receives from its customers on account of its local position. It is the subject of value and price, and of bargain and sale, though intangible. But in order to be conveyed, mention must be made of it in the act of sale. The good will of a business is not the business, but is one result springing out of it. It would be too narrow to construe the word ''business'' to be the good will of the business.''

In *Matter of Silkman*, 121 App. Div. (N. Y.) 202, 105 N. Y. Sup. 872 it is said: ''In valuing the good will in which the estate of a deceased partner is to share, it should be based on the profits of the business before his death, not upon the profits made thereafter.'' Which is in exact accordance with the method of ascertaining its value resorted to in the case before us.

In 30 Cyc. 687, in speaking of the good will of a firm, it is said: ''This constitutes a part of the firm's assets and upon dissolution every partner is entitled to have it converted into cash and included in the firm's accounts, unless by his agreement or conduct he has precluded himself from asserting such right. In computing the value of the good will of a decedent's business at the time of his death, the basis should be the annual profits before his death.'' The annual profits are resorted to merely as throwing light upon and as affording a reasonable mode by which the value of the intangible asset

known as good will may proximately be measured and ascertained; but it certainly is not intended that good will is profits or that profits are good will. They are things wholly separate and distinct, and have no sort of relation the one to the other except that courts resort to earning capacity as a means of ascertaining the value of the intangible asset known as good will.

The subject is discussed in *Nelson* v. *Hiatt,* 38 Neb. at p. 485, 56 N. W. 1029, and the court cites with approval *Carey* v. *Gunnison,* 17 N. W. 885, where it is said: "The good will connected with the establishment of any particular trade or occupation may be the subject of barter and sale. It is 'a valuable right, and if it be unlawfully destroyed or taken away, the law will award compensation to the injured party. It is defined to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity, or reputation for skill, affluence, or punctuality; or from other accidental circumstances or necessities, or even from ancient partialities or prejudice.' (Bouv. Law Dict.; Story, Partn. sec. 99.) We do not understand that counsel for defendant claims that what may be properly called 'good will' is not the subject of contract, and that one acquiring it may not maintain an action for its deprivation. But he insists that that for which defendant seeks to recover in its action is not properly good will, but rather profits of trade. The distinction between the two is obvious. Profits are the gains realized from trade; good will is that which brings trade."

For these reasons we are of opinion that the common stock in dispute was issued in payment for the good will

of the firm of Davie & Whittle; that the previous earnings of the firm were taken as the measure of the value of the good will; and that the common stock is to be distributed as any other asset in the proportion in which the partners had contributed to the capital of the partnership. We are, therefore, of opinion that the decree of the circuit court should be affirmed.

*Affirmed.*